IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

CESAR JESUS GONZALO DEL RIO,

                        Plaintiffs,                          OPINION and ORDER

        v.                                                        20-cv-493-wmc

MARSHALL POLICE DEPARTMENT and
JOSEPH NICKEL,

                        Defendants.

On May 20, 2020, defendant Marshall Police Department ("MPD") Officer Joseph Nickel pulled over a vehicle driven by plaintiff Cesar Jesus Gonzalo Del Rio (hereinafter "Gonzalo"), believing that he lacked a valid driver's license. That traffic stop lasted approximately 30 minutes, during most of which Officer Nickel tried to obtain, and Gonzalo refused to provide, his license. Instead, Gonzalo repeatedly charged Nickel with stopping him unjustifiably. Ultimately, however, Gonzalo provided his driver's license; Nickel confirmed that his license was suspended; and Gonzalo was cited for operating with a suspended license in violation of Wis. Stat. § 343.44.

Now proceeding *pro se* in this lawsuit under 42 U.S.C. § 1983, Gonzalo does not contest that charge, but rather claims that the Marshall Police Department and Officer Nickel violated his Fourth Amendment rights because (1) the traffic stop was not supported by reasonable suspicion, and (2) Nickel unnecessarily extended the length of the stop. Gonzalo further claims that Nickel violated his Fifth Amendment right against self-incrimination and committed numerous other wrongful acts, including making false

1

accusations and charges, obstructing justice, threatening and harassing him, racial profiling, and abuse of authority.

Defendants seek summary judgment on all of Gonzalo's claims (dkt. #11), to which Gonzalo has now responded both by opposing that motion (dkt. #21), and by seeking leave to amend his complaint (dkt. #20). The court will deny Gonzalo's motion to amend since his delay in amending is unjustified *and* his proposed amendment would be futile. As for defendants' motion, the Marshall Police Department is entitled to summary judgment because it is not a suable entity under § 1983 and because its liability would only flow through Officer Nickel, who is also entitled to summary judgment. The entirety of Nickel's interaction with Gonzalo was captured by his body camera, which removes any conceivable dispute of fact related to Nickel's handling of the traffic stop. *See Scott v. Harris*, 550 U.S. 371, 381 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a summary judgment motion.").

Perhaps plaintiff Gonzalo is right in immediately assuming that Officer Nickel intentionally picked him out for a license check because of his race, but he offers no evidence that Officer Nickel had engaged in such selective enforcement, on May 20 in particular, or when engaged in routine license plate checks more generally. Nor are his last-minute, conclusory allegations in a proposed amended complaint sufficient to support a finding that Officer Nickel's actions on May 20 was a larger practice of harassment by the MPD. In the end, since the evidence before this court on summary judgment does not

permit a reasonable jury to find that Nickel lacked reasonable suspicion to initiate the traffic stop nor that he unnecessarily lengthened the traffic stop, the court will grant defendants' motion for summary judgment in full, enter judgment in defendants' favor and close this case.

## UNDISPUTED FACTS [1]

As of May 20, 2020, MDP Police Officer Joseph Nickel was patrolling the Village of Marshall in his squad car, using a mobile computer to run routine license plate checks of vehicles.  At approximately 1:50 p.m., while Officer Nickel was monitoring the intersection of School Street and West Main Street, Gonzalo drove up, prompting Nickel to run a license plate check on his vehicle.  The license plate check showed that the vehicle had been involved in a local incident, that Gonzalo was one of the drivers associated with the vehicle, and that his driver's license had been suspended.  Nickel then ran a search of Gonzalo's name in the Wisconsin Department of Transportation ("DOT") database, which confirmed that his license was still suspended.  The DOT database also included a photograph of Gonzalo, which Nickel believed was the person driving the vehicle he had just observed.

At that point, Nickel proceed to pull over the vehicle.  Video footage captured the entirety of this traffic stop (Nickel Aff., Ex. 1), beginning with Officer Nickel approaching

---

[1]  Unless otherwise noted, the following facts are undisputed.  The court has drawn the facts from the parties' proposed findings of fact and responses, as well as the underlying evidence submitted in support, all viewed in a light most favorable to plaintiff as the non-moving party.

the vehicle and introducing himself, prompting Gonzalo to ask for his badge number. Nickel provided his badge number and then requested Gonzalo's driver's license and proof of insurance.  However, Gonzalo did not comply with his request; instead, he asked Nickel to provide him a lawful reason for the traffic stop, to which Nickel responded:

> When I checked the vehicle registration, one of the associated drivers to this vehicle came back with a suspended license.  I looked at the driver's license image, it appeared to be you.  Therefore, I stopped the vehicle.

(*Id.* at 1:05-1:21.)  Gonzalo responded that he would not produce his driver's license or proof of insurance unless Nickel provided a lawful reason for the traffic stop.  Gonzalo further stated:  "I would like to have your supervisor come down here so I can speak to your supervisor because you're obstructing justice."  (*Id.* at 1:30-1:37.)  Gonzalo also told Nickel that he was acting beyond his authority, a charge Nickel denied.  (*Id.* at 1:38-1:39.)

Nickel again asked for a driver's license, and Gonzalo again refused to produce it, threatening to report Nickel for "harassment," "racial profiling," and "targeting a Mexican kid."  (*Id.* at 2:00-2:09.)  Nickel then asked if Gonzalo would provide his driver's license, and Gonzalo repeated that he would not produce those items without Nickel providing a lawful reason for the stop, again asking to speak with a supervisor and adding that he would call the FBI.  At that point, Nickel walked back to his squad car, called a supervisor and started reviewing Gonzalo's records on his computer while he waited for the supervisor to arrive.  This took less than five minutes.  (*See id.* at 2:45-7:09.)

When MPD Lieutenant Kristine Quam arrived, Nickel briefed her on the situation, including the reason for the traffic stop.  Lt. Quam then approached Gonzalo's vehicle, who immediately requested her name and badge number, which Quam provided.  Gonzalo

next asked her to provide a lawful reason for the traffic stop, but as Quam attempted to respond, he interrupted and repeated his request for a lawful reason for the stop. (*Id.* at 9:03-9:32.) After Quam asked Gonzalo to let her answer, he indicated in response that the reason was not lawful. (*Id.*) Quam then told Gonzalo that he was not free to go and should remain in the vehicle, before walking back to the squad car and speaking with Nickel.

Slightly more than a minute after Quam left Gonzalo's vehicle, dispatch also confirmed that Gonzalo had a suspended driver's license. (*Id.* at 10:45-11:06.) Nickel next showed Quam the photograph of Gonzalo from the DOT database, to which Quam responded "yea that's him," (*id.* at 11:12-11:20), and Nickel decided to issue Gonzalo a citation for operating a suspended license. Up to this point, according to the time reflected on the video, the traffic stop had lasted approximately 12 minutes.

Reapproaching the vehicle to obtain Gonzalo's current address, Officer Nickel found he was now refusing to roll down his driver's side window. Nickel then repeated the reason for the traffic stop and asked him for a current address, explaining that he would be receiving a citation for operating a suspended driver's license. Gonzalo also would not provide that information, asked again for a lawful reason for the traffic stop and stated that he would take Nickel to court. Nickel then returned to his squad car to prepare the citation, including filling out the forms necessary to complete the citation, discussing the details of his interaction with Gonzalo with Lt. Quam and responding to officer communications, all of which took seven-and-a-half minutes. (*Id.* at 14:00-21:30.) Officer Nickel next reapproached the vehicle, and explained the court date, the number of points

5

associated with the violation, and the applicable fine, to which Gonzalo responded by repeating his intent to sue Nickel.  (*Id.* at 21:31-22:30.)  When Gonzalo refused to take the citation, Nickel dropped it through a narrow opening in the window of the vehicle. Nickel also instructed Gonzalo to pull the vehicle forward to clear the driveway it was blocking and park the vehicle, informing him that while "you can leave, the vehicle cannot" because he did not have a valid driver's license.  (*Id.* at 22:58-23:40.)

Instead of pulling the vehicle forward, Gonzalo insisted that he had been detained unlawfully and asked to speak with Quam again, repeating that he was going to sue Nickel. After Lt. Quam approached and spoke with Gonzalo, he denied being the individual named in the citation, prompting Quam to ask him to prove as much.  (*Id.* at 25:55-26:13.) However, because of his denial, Nickel interrupted and ordered Gonzalo to exit the vehicle to confirm his identity, and when Gonzalo refused, Nickel advised that he would break the window if Gonzalo refused to exit.  (*Id.* at 26:13-26:23.)  This threat prompted Gonzalo to exit the vehicle, and Nickel again ordered Gonzalo to provide his driver's license or a photo identification to confirm his identity, which Gonzalo again refused to do.

At that point, Nickel said that Gonzalo had two options:  "Provide documentation showing who you are . . . in order to properly identify you, [or] I will detain you, I will take you to the Dane County jail, and will use our FAST-ID system to attempt to identify you." (*Id.* at 27:20-27:30.)  Faced with this choice, Gonzalo finally complied, and Officer Nickel took two more minutes to review Gonzalo's driver's license, confirm his identity and verify that the information in the citation matched the information listed on the driver's license. Nickel then told Gonzalo that he was free to leave, but repeated that he could not drive

6

the vehicle away because his driver's license was suspended.  Gonzalo responded that he would report Nickel as a "terrorist" to the FBI, and the traffic stop ended.  (*Id.* at 30:25.)

On June 1, 2020, Gonzalo filed a citizen complaint alleging that his rights were violated during the May 20, 2020, traffic stop.  MPD Chief John Nault investigated by: interviewing Officer Nickel and Lt. Quam; reviewing the available audio and video; requesting the DOT information Nickel used; and evaluating the information Nickel used to initiate the traffic stop.  Nault determined that the complaint was unfounded and sent Gonzalo a letter communicating this determination on June 10, 2020.  Gonzalo appealed that determination to the Village of Marshall Finance & Oversight Committee, who agreed that Gonzalo's claims were unfounded.  This lawsuit followed.

OPINION

The court will begin this opinion by addressing plaintiff's motion to amend and then will address the merits of defendants' motion for summary judgment.

## I.     Motion to amend (dkt. #20)

In response to defendants' motion for summary judgment, plaintiff seeks to broaden his claims exponentially.  Although including few additional factual allegations, plaintiff seeks to add dozens of claims against MPD Chief John Nault and the MPD generally for mistreatment starting in 2019.  Although a motion to amend should be granted "when justice so requires," *see* Fed. R. Civ. P. 15(a)(2), "district courts have broad discretion to deny leave to amend where there is undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendants, or where the amendment would be

futile." *Arreola v. Godinez*, 546 F.3d 788, 796 (7th Cir. 2008).  Here, leave to amend at this late stage of the lawsuit, after defendants filed their motion for summary judgment as to the specific conduct alleged, is inappropriate because of undue delay, undue prejudice to the current defendants, and futility.

Plaintiff does not even offer an explanation for his failure to include these additional, broader claims in his lawsuit until now.  When considered against the obvious prejudice defendants would suffer if required to essentially restart this lawsuit, this failure to explain his delay weighs heavily against an amendment at this point.  As importantly, Gonzalo's proposed additional allegations do not appear to be related to the events of May 20, 2020, that gave rise to the original claims in this lawsuit, and they certainly do not support those claims except as the alleged culmination of a longer pattern of harassment. As such, plaintiff now seeks to include claims arising from his belief that since 2019, MPD officers have been targeting him for mistreatment, following him, harassing him, surveilling his home, and trying to catch him for minor traffic violations, including apparently and most specifically, a reference to a previous stop for a missing headlight in a serious, unjustified beating.  While he now claims that these harassing tactics violated various constitutional rights and ruined his record and life, plaintiff does not suggest that Officer Nickel was involved in *any* of these events, except for the May 20, 2020, traffic stop, nor has plaintiff offered evidence that Nickel even knew him before that traffic stop.  Thus, at the outset, plaintiff's proposed amendments to his complaint appear to run afoul of Federal Rule of Civil Procedure 20, which permits plaintiffs to join claims together in one lawsuit if "they assert any right to relief jointly, severally, or in the alternative with respect to or

8

arising out of the same transaction, occurrence, or series of transactions or occurrences."
Fed. R. Civ. P. 20(a)(1)(A).

Even assuming that plaintiff had a good faith basis to claim that Officer Nickel's
handling of the May 20, 2020, traffic stop was the last of a series of earlier harassing actions
by the MPD, the few factual allegations he is proposing to add do not satisfy the pleading
requirements of Federal Rule of Civil Procedure 8, which requires a "'short and plain
statement of the claim' sufficient to notify the defendants of the allegations against them
and enable them to file an answer." *Marshall v. Knight*, 445 F.3d 965, 968 (7th Cir. 2006).
Dismissal is proper "if the complaint fails to set forth 'enough facts to state a claim to relief
that is plausible on its face.'" *St. John's United Church of Christ v. City of Chi.*, 502 F.3d 616,
625 (7th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In
particular, the proposed complaint fails to describe (1) *who* was responsible for this alleged
mistreatment (beyond MPD officers generally), (2) *when* these events actually occurred, or
(3) how the MPD officers violated his constitutional rights, other than a vague reference
to an unjustified harassment and a physical assault by unidentified MPD officers, at some
unstated time.  Nor, again, does plaintiff explain why this far more egregious conduct and
larger context is only being raised now.  Regardless, his conclusory assertions of additional
harassment and mistreatment are insufficient to satisfy the pleading requirement of § 1983,
much less justify delaying resolution of the existing, specific claims now fully briefed and
before the court on summary judgment.  *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th
Cir. 2011) (in evaluating whether a complaint meets the plausibility standard, the court
must "accept the well-pleaded facts as true, but legal conclusions and conclusory allegations

merely reciting the elements of a claim are not entitled to this presumption of truth")
(citing *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009)).  Accordingly, the court will deny
Gonzalo's motion to amend at this late date and turn to defendants' motion for summary
judgment.

In so ruling, the court is not deciding that plaintiff has no claim against the Village
for a longer-term pattern of harassment for reasons of his race.  Certainly such profiling is
not unheard of for minorities, or just an outsider in an insular, small community especially
after running afoul of local law enforcement already, as plaintiff alludes to doing.  But the
time to raise such a sweeping claim is not by trying to introduce vague, conclusory
allegations in response to a pending summary judgment motion on a complaint that until
now expressly arose out of a *very* specific set of events during a single traffic stop by one
police officer.

## II.     Defendants' motion for summary judgment (dkt. #11)

Summary judgment is appropriate if the moving party shows "there is no genuine
dispute as to any material fact and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a).  If the moving party meets this burden, then the non-moving party
must provide evidence "on which the jury could reasonably find for the nonmoving party"
to survive summary judgment.  *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–
07 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted).
During summary judgment, disputed facts are viewed in a light most favorable to the
plaintiff as the non-moving party; however, this treatment does not extend to inferences
supported merely by speculation or conjecture.  *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d

807, 812 (7th Cir. 2017); *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019). Defendants seek summary judgment for the Marshall Police Department because that entity may not be sued under § 1983, and in favor of Officer Nickel on the merits and on qualified immunity grounds.

### A.     Marshall Police Department

A police department is merely a department of the Village, not a separate legal entity subject to suit under § 1983.  *See Best v. City of Portland*, 554 F.3d 698, 698 n.1 (7th Cir. 2009) (police department is not a suable entity under § 1983); *Whiting v. Marathon Cty. Sheriff's Dep't*, 382 F.3d 700, 704 (7th Cir. 2004) ("[T]he Marathon County Sheriff's Department is not a legal entity separable from the county government which it serves and is therefore, not subject to suit.") (citation omitted).  Accordingly, the dismissal of the Marshall Police Department will be with prejudice.

To the extent plaintiff would request leave to amend his complaint to proceed against the Village of Marshall, his allegations do not support such a claim.  Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), to state a claim against a county, plaintiff must allege that the constitutional violation was "caused by: (1) an official policy adopted and promulgated by [the county's] officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010).  A custom cannot be established through a single incident.  *Palmer v. Marion Cty*, 327 F.3d 588 (7th Cir. 2003).

The evidence of record does not begin to challenge to an official policy or custom of the Village of Marshall.  Instead, plaintiff asserts that Nickel did not have reasonable suspicion to pull him over and then should have let him go.  Of course, in his proposed amended complaint, plaintiff appears to be challenging what he perceives to be far-reaching, unconstitutional practices of the Marshall Police Department, but the court denied him leave to amend his complaint to pursue those claims in this lawsuit, and in any event, his claims are based purely on conclusory assertions.  Accordingly, the Marshall Police Department is entitled to dismissal with prejudice.

## B.    Fourth Amendment Claim Against Nickel

This leaves plaintiff's originally pleaded claim against Officer Nickel for a wrongful traffic stop on May 20, 2020.  The Fourth Amendment provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. Amend. IV.[2]  In *Navarette v. California,* 572 U.S. 393 (2014), the United States Supreme Court explained:

> The Fourth Amendment permits brief investigative stops–such as the traffic stop in this case–when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity.   The reasonable suspicion necessary to justify such a stop is dependent upon both the content of information possessed by police and its degree of reliability.   The standard takes into account the totality of

---

[2] The protections of the Fourth Amendment were extended to the states under the Fourteenth Amendment.  *See Zoretic v. Darge*, 832 F.3d 639, 643 (7th Cir. 2016) ("The Fourth Amendment's protections against unreasonable searches and seizures is made applicable to state actors under the Fourteenth Amendment." (citing *DKCLM, Ltd. v. Cty. of Milwaukee*, 794 F.3d 713, 714 (7th Cir. 2015))).

> the circumstances–the whole picture.  Although a mere hunch
> does not create reasonable suspicion, the level of suspicion
> the standard requires is considerably less than proof of
> wrongdoing by  a  preponderance of the evidence and
> obviously less than is necessary for probable cause.

*Id*. at 396-97 (citations omitted); *see also United States v. Flores*, 798 F.3d 645, 648 (7th Cir. 2015) (citing *Navarette*, 572 U.S. at 396-97).

When determining the reasonableness of a traffic stop, the court is *not* to "consider the subjective motivations of the officer." *Jones v. City of Elkhart, Ind.*, 737 F.3d 1107, 1114 (7th Cir. 2013); *see also United States v. Edwards*, 769 F.3d 509, 516 (7th Cir. 2014) (citing *Whren v. United States*, 517 U.S. 806, 812 (1996)).   To justify a traffic stop, therefore, it is sufficient if a reasonable officer would believe that the defendant has committed a traffic violation; it is not necessary that this traffic violation actually occurred, nor does it matter if the officer had an ulterior motive for initiating the stop.  *See Jones*, 737 F.3d at 1114 (citing *United States v. Muriel*, 418 F.3d 720, 724 (7th Cir. 2005) ("we need only inquire whether the officer had probable cause to believe that a traffic violation occurred, not whether [the driver] actually was tailgating); *United States v. Cashman*, 216 F.3d 582, 586-87 (7th Cir. 2000) ("The pertinent question . . . is whether it was reasonable  for [the officer] to *believe* that the windshield was cracked to an impermissible degree.") ) .

While difficult to define, "reasonable suspicion" is itself "a commonsense, nontechnical concept that deals with the factual and practical considerations of 'everyday life on which reasonable and prudent [people], not legal technicians, act.'" *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006) (quoting *Ornelas v. United States*, 517 U.S. 690, 695 (1996)).  Still, although reasonable suspicion "'is a less demanding standard than

probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification.'" *Id.* (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). "In other words, reasonable suspicion is less than probable cause but more than a hunch." *Id.* (citing *United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003)).

### 1. Traffic stop

As an initial matter, although one could understand that plaintiff Gonzalo suspected otherwise, that he was being improperly targeted, especially if the general allegation in his amended complaint were credited, the undisputed facts establish that Nickel had reasonable suspicion to initiate the traffic stop. Not only does the evidence of record support a finding of reasonable suspicion, but Nickel's *actual* intent is irrelevant to the validity of the stop itself. Whether or not it is a *good* police practice given the potential for its being used as a pretense for selective enforcement or even racial profiling, Officer Nickel running license plates of vehicles when patrolling is a standard and legally recognized method to confirm that a vehicle is properly registered, and that the driver possesses a valid license. *See United States v. McPhaul*, 835 F.3d 687, 690 (7th Cir. 2016) ("The district court wrote that 'Officer Sell observed Mr. McPhaul commit two, and possibly three, traffic infractions, and after running his license plate (which is a reasonable practice of police officers), learned that the car was registered to [a] driver with a suspended license. Officer Sell had probable cause to initiate a traffic stop.' We agree."); *United States v. Bentley*, 795 F.3d 630, 634-35 (7th Cir. 2015) ("Finally, Bentley points out that officer Veerman testified that an owner's suspended license was insufficient for a traffic stop and that he

would not have pulled Bently over but for the lane violation.   Officer Veerman was mistaken.  He could have stopped Bentley's vehicle on the ground of the owner's suspended license alone.") (citing *United States v. Jerez*, 108 F.3d 684, 693 (7th Cir. 1997)).

Moreover, the information Nickel learned from his initial search -- that the vehicle had been involved in a "local incident" -- justifiably prompted him to investigate who was associated with that vehicle.   Indeed, once Nickel learned that (1) the DOT database showed that Gonzalo's driver's license was suspended; and (2) the driver of the vehicle appeared to be Gonzalo, he had more than just a hunch that Gonzalo was the driver of the vehicle; he had probable cause to believe that Gonzalo was violating Wis. Stat. § 343.44, which prohibits an individual from operating a vehicle with a suspended driver's license. *See State v. Smith*, 2000 WI App 161, P 9, 238 Wis. 2d 96, 617 N.W.2d 678 (driver may be pulled over and arrested for driving with a suspended license); *see also  United States v. Bentley*, 795 F.3d at 635 (agreeing that an officer may stop a vehicle if the officer has "sufficient facts to justify a reasonable suspicion that the driver" does not possess a valid driver's license); *see also United States v. Muriel*, 418 F.3d 720, 724 (7th Cir. 2005) ("Probable cause exists when the circumstances confronting a police officer support the reasonable belief that the driver has committed even a minor traffic offense.") (citation omitted).

Plaintiff has not come forward with evidence even beginning to dispute Nickel's legitimate basis to pull him over.  Indeed, the undisputed facts are that Gonzalo himself *knew* he was driving without a valid license, which is at least partly why he repeatedly refused to turn over his license for inspection.  Accordingly, no reasonable fact-finder could

conclude that Officer Nickel's initial decision to pull plaintiff over objectively lacked reasonable suspicion.

### 2. Length of stop

Nor, contrary to plaintiff's claim, did the 30-minute traffic stop that followed run afoul of the Fourth Amendment. "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *See Illinois v. Caballes*, 543 U.S. 405, 407 (2005). More specifically, an officer may not prolong a stop for inquiries "not fairly characterized as part of the officer's traffic mission," absent reasonable suspicion to independently support the line of questioning. *Rodriguez v. United States*, 575 U.S. 348, 356 (2015). Here, the actual video recording of plaintiff's stop simply does not permit a jury to find that Officer Nickel unnecessarily extended the length of the traffic stop. On the contrary, *plaintiff's* insistence to speak with Nickel's supervisor, then subsequent denial of his obvious identity and refusal to exit his vehicle were causes for the stop to last a full 30 minutes.

To begin, Officer Nickel approached the vehicle plaintiff was driving, identified himself, asked Nickel to provide his driver's license and proof of insurance, and explained the reason for the traffic stop. Nickel's recorded statements were direct and brief, and he responded directly to plaintiff's request that Nickel provide his badge identification number. This exchange was entirely appropriate, lasting a short period of time and relating directly to the reason for the stop. *See United States v. Lewis*, 920 F.3d 483, 492 (7th Cir. 2019) (recognizing that the Constitution permits officers to ask questions even *unrelated*

16

to the traffic stop, so long as the questioning does not unreasonably prolong the stop past what is necessary to "complete the mission" of the stop); *United States v. Offord*, 788 F. App'x 384, 386 (7th Cir. 2019) (officer who "took actions ordinary to a traffic stop" -- explaining the reason for the stop, asking where the driver and passenger were coming from, requesting identification and then bringing driver back to squad car when she could not provide identification -- did not unnecessarily prolong the stop).

Then, at *plaintiff's* insistence, an approximate five-minute delay occurred between Nickel calling Lt. Quam to the scene and her arrival.  Given the reasons for this delay, Officer Nickel cannot be faulted for the relatively short time it took for Quam to arrive. In any event, plaintiff's uncooperative behavior, and apparent animus towards Nickel specifically, made Nickel's decision to comply with plaintiff's request to speak with his supervisor eminently prudent, and at the very least to provide a buffer between Nickel and plaintiff.  *See Buchanan v. Kelly*, 592 F. App'x 503 (7th Cir. 2014) (agreeing that calling for backup to ensure officer safety was a reasonable basis to extend a traffic stop).

Even then, by the approximate twelfth minute mark of the stop, Lt. Quam had agreed that the driver was indeed Gonzalo, and Nickel had decided to cite plaintiff for driving without a valid driver's license.  As reviewed in more detail above, Officer Nickel reapproached the vehicle simply to confirm plaintiff's address, which while more of a courtesy then a necessity, was a reasonable step in ensuring he had the correct information to complete the citation.  Regardless, since this line of questioning took place *after* Nickel concluded that a citation would be appropriate, this additional two-minute exchange also did not impermissibly extend the stop.  *See Offord*, 788 F. App'x at 386 (officer did not

extend stop by asking questions while performing a criminal check and looking up a driver's license); *United States v. McBride*, 635 F.3d 879, 882, 883 (7th Cir. 2011) (questioning that occurred after citation was issued and lasted only minutes, did not unreasonably extend a traffic stop).

Nor was the seven minutes that followed while Nickel prepared and printed out the citation unreasonable.  Rather, such administrative tasks are recognized as necessary and appropriate components of a reasonable traffic stop, and there is no indication that Nickel took longer than necessary to complete them.  *E.g., McBride*, 635 F.3d at 883 (officer "spent most of the stop performing routine police work -- securing the scene, gathering information . . . , relaying information to dispatch, and writing the ticket," none of which unnecessarily extended its length); *United States v. Finke*, 85 F.3d 1275, 1280 (7th Cir. 1996) (decision to request and wait for a background check was justified, since it took just five minutes, and involved no additional questioning or action on the part of defendant officers, and did not unreasonably prolong traffic stop).

Finally, while the traffic stop did not end for another 17 minutes after Nickel completed writing up the citation, this further delay was almost entirely *plaintiff's* doing, initially by refusing to move and exit his vehicle, then far worse, by affirmatively denying his identity to Quam and Nickel, which prompted Nickel to reasonably extend the stop. Indeed, at that point, if not well before, an objectively reasonable officer had sufficient grounds to require plaintiff to leave the vehicle and provide his driver's license.  *See United States v. Martin*, 422 F.3d 597, 602 (7th Cir. 2005) ("[F]ailure to produce a valid driver's license necessitated additional questioning while the trooper ascertained whether or not

Mr. Martin was a licensed driver."); *see also United States v. Robinson*, 78 F. App'x 501, 505 (6th Cir. 2003) (removing driver from vehicle when he could not provide license was reasonably related to the stop); *United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005) ("The majority of the nearly forty-five minute encounter was spent completing the traffic stop, including time spend by [the officer] to confirm the identity of [the driver] based upon the highly suspect ID that he had provided."); *United States v. Pedraza-Bucio*, No. 08 CR 698, 2009 WL 1110332, at *4 (D. Utah Apr. 23, 2009) (stop not unreasonably prolonged where driver did not have license, police officer could not obtain a reliable identification through computer searches, ultimately leading officer to confirm identity of driver through fingerprinting).

In short, whatever plaintiff might claim were Lt. Quam's or Officer Nickel's motives or hidden agenda, the video footage by itself prevents a reasonable jury from finding that Officer Nickel unnecessarily prolonged this traffic stop under an objective officer standard. Thus, he is entitled to summary judgment with respect to plaintiff's Fourth Amendment claim against him.

## C.  Plaintiff's remaining claims

Defendant Nickel is also entitled to summary judgment on any additional claims plaintiff has legitimately pursued in this lawsuit.  As for any remaining federal claims, plaintiff invokes his right not to incriminate himself and remain silent (Compl. (dkt. #1) 3), but the evidence of record does not support a claim under § 1983 for a Fifth Amendment violation.  The Fifth Amendment privilege against self-incrimination provides

that no person "shall be compelled in any criminal case to be a witness against himself," U.S. Const. amend. V, "a fundamental trial right of criminal defendants." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 263, 110 S. Ct. 1056 (1990). Under § 1983, therefore, recovery for a Fifth Amendment violation is available for "courtroom use of a criminal defendant's compelled, self-incriminatory testimony." *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1027 (7th Cir. 2006) (citing *Burrell v. Virginia*, 395 F.3d 508, 513 (4th Cir. 2005)); *see also Hanson v. Dane Cty., Wis.*, 608 F.3d 335, 339-40 (7th Cir. 2010) (although police elicited a statement without *Miranda* warnings, no Fifth Amendment violation occurred because that statement was never used against the speaker during criminal proceeding). Here, neither plaintiff's silence nor his statements were used in a courtroom setting to incriminate him; indeed, there was no criminal prosecution whatsoever. Moreover, Nickel did not rely on *any* statements plaintiff made before issuing him a citation for driving without a valid license. Instead, Officer Nickel issued the citation based on his identifying the person listed in the DOT's database as "Cesar Del Rio Gonzalo" as the driver of the vehicle he stopped, a belief that Lt. Quam's confirmed. Accordingly, no evidence of record supports recovery of a Fifth Amendment violation.

Similarly, Nickel is entitled to summary judgment with respect to plaintiff's numerous state law claims. Since the court has found that defendants are entitled to summary judgment on plaintiff's federal claims, the court's typically practice is not to decide plaintiffs' state law claims on the merits, but instead dismiss those claims without prejudice to refiling in state court. Indeed, dismissal is consistent with "the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental

claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly &* *Co.*, 193 F.3d 496, 501 (7th Cir. 1999); *see also* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if the district court has dismissed all claims over which it has original jurisdiction.").

Nevertheless, the court may depart from its "usual practice" and continue to exercise supplemental jurisdiction to dispose of other state law claims if the circumstances weigh in favor of doing so.  For example, a court need not send back to state court "'doomed litigation' that will only be dismissed once it gets there."  *Groce*, 193 F.3d at 502; *In re Repository Tech., Inc.*, 601 F.3d 710, 725 (7th Cir. 2010) ("when a state-law claim is clearly without merit, it invades no state interest -- on the contrary, it spares overburdened state courts additional work that they do not want or need -- for the federal court to dismiss the claim on the merits, rather than invite a further, and futile, round of litigation in the state courts.") (internal quotation omitted).  At least when it comes to claims arising solely out of the single traffic stop captured on video on May 20, 2020, this exception to the general rule applies.

Plaintiff's conclusory claims of false imprisonment, accusations or charges, obstruction of justice, threats, harassment, abuse of authority, racial profiling or a hate crime, all fail as a matter of law with respect to this stop because the video evidence establishes that Officer Nickel had a justifiable reason to pull plaintiff over, to detain him in an effort to investigate whether plaintiff had a valid license, to cite him, to confirm his actual identity and address, and to ensure that plaintiff would not unlawfully drive away in his vehicle.  Whatever the merit of plaintiff's conclusory assertions that MPD officers

targeted him inappropriately and committed state torts, those claims are not properly before this court, just as no federal constitutional or statutory claims are properly asserted in this case.

Accordingly, the court is granting summary judgment in Nickel's favor with respect to plaintiff's Fifth Amendment and state law claims.


ORDER

IT IS ORDERED that:

1. Defendants Marshall Police Department and Joseph Nickel's motion for summary judgment (dkt. #11) is GRANTED on the grounds set forth above.

2. Plaintiff Cesar Jesus Gonzalo Del Rio's motion to amend (dkt. #20) is DENIED.

3. Plaintiff's motion not to dismiss lawsuit (dkt. #19) is DENIED.

4. The clerk of court is directed to enter judgment in defendant's favor and close this case.

Entered this 2nd day of June, 2021.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge